No. 76,290

AMCO INSURANCE COMPANY, *Appellant*, v. GERALD BECK and CHRISTA BECK, husband and wife; and TERI BECK, a minor; *Defendants*, and JOHN MORAN and SUSAN MORAN, husband and wife; and COURTNEY MORAN, a minor, *Appellees*.

929 P.2d 162

Opinion filed December 20, 1996.

*Paula J. Wright*, of Clark, Mize & Linville, Chartered, of Salina, argued the cause and was on the briefs for appellant.

*Richard A. Boeckman*, of Keenan & Boeckman Law Firm, P.A., argued the cause, and *Martin J. Keenan*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

ABBOTT, J.: The trial court held that the business exclusion in the insureds' homeowner's policy did not preclude liability coverage concerning a claim made against the insureds arising out of the insureds' teenage daughter's babysitting activities. We agree.

AMCO Insurance Company sold Gerald and Christa Beck a homeowner's insurance policy which included liability coverage for the Beck family, including the Becks' 15-year-old daughter, Teri Beck. While Teri was babysitting John and Susan Moran's two children, one of the children, Courtney Moran, suffered burns over her head, body, and extremities.

The Morans brought suit against Teri Beck on behalf of their daughter, Courtney. AMCO filed a declaratory judgment action

against Gerald, Christa, and Teri Beck, as well as John, Susan, and Courtney Moran, asking the trial court to determine whether the homeowner's policy provided coverage for the suit filed against Teri Beck. The trial court found that the policy's business exclusion did not preclude coverage, and AMCO appealed.

This case was originally before this court in *AMCO Ins. Co. v. Beck*, 258 Kan. 726, 907 P.2d 137 (1995). However, while the business exclusion question had been decided, there were still some issues regarding coverage which had not yet been decided. Thus, we held the order appealed from was not a final order and dismissed the appeal for lack of jurisdiction. AMCO subsequently abandoned the remaining issues and consented to entry of a final judgment on the business exclusion issue. AMCO appealed again to the Kansas Court of Appeals, and the case was transferred to this court pursuant to K.S.A. 20-3018(c).

The sole issue before this court is whether the policy's business exclusion precluded coverage for a suit filed against Teri Beck by the Morans to recover damages for Courtney's injuries.

The parties filed a stipulation of facts, which provides:

"1. AMCO Insurance Company insures defendants Gerald J. Beck and his wife, Christa Beck, under homeowners policy of insurance, policy No. HA 4612140-0, with a policy period from 10/08/92 to 10/08/93 (insurance policy). . . .

"2. Defendants Gerald J. Beck and his wife, Christa, have a fifteen year old daughter, defendant Teri Beck, who resides with them at their household in Claflin, Kansas, and is therefore an insured under the AMCO policy of insurance.

"3. During the months of June, July and August, defendant Teri Beck was employed by defendants John and Susan Moran, of Rural Route, Bushton, Kansas, to babysit the two Moran children at the Moran residence.

"4. The defendant Moran family and the defendant Beck family are not related.

"5. Defendants John and Susan Moran employed defendant Teri Beck to babysit Tyler Moran, age 5, and defendant Courtney Moran, 30 months, on Monday, Wednesday and every other Friday, or as needed. Defendant John Moran works in the oil field and because of the weather, there would be days when defendant Teri Beck was not needed because defendant John Moran was not able to work.

"6. Defendant Susan Moran would pick defendant Teri Beck up in the morning at approximately 7:10 a.m. and take defendant Teri Beck to the Moran residence near Bushton, Kansas. Defendant Teri Beck's working hours were 7:20 a.m. to 5:30 p.m. Monday, Wednesday and every other Friday.

"7. Defendant Teri Beck's duties were to watch the children, take care of their needs, prepare their meals, entertain them, and perform light housekeeping duties

such as doing dishes and straightening up the house. When she was first hired, the issue of bath was not specifically addressed. Defendant Teri took it upon herself to bathe the children occasionally.

"8. On July 9, 1993 before defendant Susan Moran went to work, she asked defendant Teri Beck not to bathe the children, because she, Susan, bathed the children every night and there seemed no need to bathe the children twice a day. However, at defendant Teri Beck's discretion, she could bathe the children, if necessary.

"9. Defendant Teri Beck was paid $2.00 per hour and defendants John and Susan Moran would pay her an additional $2.00 to $5.00 more a week for any extra housekeeping that defendant Teri had performed.

"10. On July 9, 1993, at approximately 10:00 a.m., defendant Teri Beck had fed the children, done the dishes and was preparing to give them baths.

"11. Defendant Teri Beck took defendant Courtney Moran, the 30 month old child, to the bathroom, undressed her, set her in the bathtub and turned on the water.

"12. Defendant Teri Beck then left defendant Courtney Moran in the bathtub with the water running.

"13. When Defendant Teri Beck returned to the bathroom, she took a cup of water from the tub and poured it over the head of defendant Courtney Moran. Defendant Teri Beck claims she did this two times.

"14. At some point in time during the bathing process, defendant Teri Beck reached down into the tub, felt the water to be very hot and immediately removed defendant Courtney from the bathtub.

"15. At approximately 2:30 p.m., defendant Teri Beck noticed that defendant Courtney was developing blisters on her body. When defendant Susan Moran came home at 4:00 p.m., she immediately rushed defendant Courtney to a local doctor in Ellinwood, Kansas, who in turn had the child taken by ambulance to St. Francis Hospital Burn Unit in Wichita where defendant Courtney Moran remained hospitalized until July 27, 1993.

"16. Defendant Courtney Moran suffered second and third degree burns over her feet, legs, buttocks, back and forehead. No skin grafting has been performed yet, but there is a possibility that skin grafting will have to be performed in the future. There is also a possibility that defendant Courtney may need scalp stretching to cover hair loss, but the doctors have told the defendant John and Susan Moran that issue will not be decided until the child is a teenager."

Based on these stipulated facts, the trial court found that Teri Beck's babysitting services did not constitute a business and that the insurance policy's business exclusion did not apply and could not preclude coverage of the Becks' claim against AMCO. AMCO challenges this ruling.

This case calls for the interpretation of an insurance policy. Insurance policies are considered contracts. *Levier v. Koppenheffer*, 19 Kan. App. 2d 971, 976, 879 P.2d 40, *rev. denied* 255 Kan. 1002 (1994). The interpretation and construction of a contract is a question of law. A trial court's interpretation of a contract may be reviewed by this court with an unlimited de novo standard of review. *Harris v. Richards*, 254 Kan. 549, 552, 867 P.2d 325 (1994); *Spivey v. Safeco Ins. Co.*, 254 Kan. 237, 240, 865 P.2d 182 (1993). However, "[t]he language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties." *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992).

The homeowner's insurance policy at issue insured defendants Gerald and Christa Beck and any person under the age of 21 in the care of the Becks. Thus, Teri Beck was insured by the policy. Under the exclusions section, the policy stated that coverage did not apply to bodily injury "arising out of business pursuits of an insured," unless the activity causing the injury was usual to non-business pursuits. This exclusion was amended in a 1987 endorsement to state that liability insurance coverage did not apply to bodily injury "arising out of or in connection with a business engaged in by an insured. This exclusion applie[d] but [was] not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed or implied to be provided because of the nature of the business." The insurance policy defined "business" as including a "trade, profession or occupation." The policy also contained an exclusion which specifically applied to babysitting services performed in one's own home. Since Teri Beck's babysitting services occurred in the Moran home, not her own home, this exclusion does not apply. Thus, the question is whether Teri Beck's babysitting activities fell within the business exclusion as a trade, profession, or occupation so that coverage of the Becks' claim is precluded.

The Kansas Court of Appeals has previously decided two cases dealing with this issue. *Krings. v. Safeco Ins. Co. of America*, 6 Kan. App. 2d 391, 628 P.2d 1071 (1981), discusses a "business pursuits" exclusion in general, while *Susnik v. Western Indemnity Co.*, 14

Kan. App. 2d 421, 795 P.2d 71, *rev. denied* 245 Kan. 788 (1989), deals specifically with whether a "business pursuits" exclusion applies to babysitting services.

In *Krings*, 6 Kan. App. 2d 391, the plaintiff was an insured of a homeowner's insurance policy and an excess insurance policy issued by the defendant. While the policies were in effect, the plaintiff became Board of Directors Chairman of the Kansas Savings & Loan Association. The plaintiff was sued in five different lawsuits for activities arising out of his position on the savings and loan board of directors. The plaintiff asked the defendant to provide a defense for the lawsuits, as promised in his homeowner's and excess insurance policies. The defendant denied coverage and refused to provide a defense. The plaintiff filed suit against the defendant for failure to provide a defense. The defendant filed a motion for summary judgment, alleging that the "business pursuits" exclusions in the policies precluded coverage of claims arising out of the plaintiff's position on the savings and loan board of directors. Both the homeowner's policy and the excess policy defined "business," like the policy at issue here, as including a trade, profession, or occupation. The trial court granted the defendant's motion for summary judgment, and the plaintiff appealed.

In analyzing the applicability of the business pursuits exclusion, the *Krings* court first discussed the purpose behind such exclusion.

" 'The "business pursuits" exclusion is a common exception to broad coverage provided in homeowners and general liability insurance policies. The reason for this particular exclusion from the general coverage provided in the policy has been analyzed and summarized by various commentators. They are in agreement that the exclusion of business liability removes coverage which is not essential to the purchasers of the policy and which would normally require specialized underwriting and rating, and thus keeps premium rates at a reasonable level. See Frazier, *The "Business Pursuits" Exclusion in Personal Liability Insurance Policies*, 572 Insurance L.J. 519, 520 (1970); Frazier, *The Business-Pursuits Exclusion Revisited*, 649 Insurance L.J. 88, 89 (1977).' " 6 Kan. App. 2d at 393.

Next, the *Krings* court promulgated a rule to distinguish between what type of activity constitutes a business pursuit and falls within a business exclusion and what type of activity is not a business pursuit and falls outside a business exclusion.

" ' "To constitute a business pursuit, there must be two elements: first, continuity, and secondly, the profit motive; as to the first, there must be a customary engagement or a stated occupation; and, as to the latter, there must be shown to be such activity as a means of livelihood, gainful employment, means of earning a living, procuring subsistence or profit, commercial transactions or engagements." ' " 6 Kan. App. 2d at 393 (quoting *Fadden v. Cambridge Mutual Fire Insurance Co.*, 51 Misc. 2d 858, 862, 274 N.Y.S.2d 235 [1966], *aff'd* 27 App. Div. 2d 487, 280 N.Y.S.2d 209 [1967]).

In adopting this rule, the Court of Appeals followed the majority of jurisdictions which have addressed the issue. The court rejected the minority rule that a "business pursuit includes every activity where profit is a motive." 6 Kan. App. 2d at 394. See *Salerno v. Western Casualty & Surety Company*, 336 F.2d 14 (8th Cir. 1964). The court also rejected the rule that " 'part-time or supplemental income activities are not "business pursuits." [Citations omitted.]' " 6 Kan. App. 2d 394-95.

In *Susnik v. Western Indemnity Co.*, 14 Kan. App. 2d 421, Cody Susnik was injured while he was under the care of a babysitter, Lovetta Donnelly. When Cody was injured, Donnelly and her husband were covered by a homeowner's insurance policy issued by Western Indemnity. Cody's parents brought a declaratory action against Western Indemnity and the Donnellys, requesting a determination of whether the Donnellys' homeowner's insurance policy provided coverage for Cody's injuries. Western Indemnity filed a motion for summary judgment. The trial court granted the motion, finding that the policy's business exclusion precluded coverage of Cody's injuries which arose out of Donnelly's babysitting services. The plaintiff appealed.

The business pursuits exclusion at issue in *Susnik* provided:

" '1. . . . . Medical Payments to Others do not apply to bodily injury . . .
. . .
b. arising out of business pursuits of any insured . . . .' " 14 Kan. App. 2d at 422.

The policy defined "business" as including a "trade, profession or occupation." 14 Kan. App. 2d at 422.

In analyzing this issue, the *Susnik* court reiterated the business pursuit rule as originally promulgated in *Krings*:

"A business pursuit is constituted of two elements: continuity and profit motive. As to the first, there must be a customary engagement or a stated occupation; as to the latter, there must be shown to be such activity as a means of livelihood, gainful employment, procuring subsistence or profit, commercial transactions or engagements." 14 Kan. App. 2d at 422-23 (quoting *Krings*, 6 Kan. App. 2d 391, Syl. ¶ 5).

The court then applied this rule to the facts of the case. Lovetta Donnelly had been providing babysitting services since 1981. She began babysitting for Cody Susnik and his brother on a regular basis in September 1985. During 1984 and 1985, Donnelly babysat four or five children all day. She also cared for some children on a part-time basis, including Cody and his brother. She charged between $6 and $8 per day per child. She received $12 per day for caring for Cody and his brother. Donnelly's 1985 tax return listed her principal business as "child day care" and reflected gross receipts of $4,024.50 from babysitting. The Donnellys listed Lovetta's babysitting as a source of household income. However, Lovetta Donnelly was not licensed as a child care provider.

Based on these facts, the court held that Donnelly's babysitting services satisfied the requirements of continuity and profit motive. The court held that the "business pursuits" exclusion applied to Donnelly's babysitting services and precluded coverage of Cody's claim against Donnelly. The Court of Appeals affirmed the trial court's grant of summary judgment to the insurance company. 14 Kan. App. 2d at 423, 427.

The only other case using Kansas law to address how a business exclusion in a homeowner's insurance policy applies to babysitting services is *U.S. Fidelity & Guar. Co. v. Heltsley*, 733 F. Supp. 1418, 1423 (D. Kan. 1990). In *Heltsley*, Jennie Heltsley, an adult, provided child care services at her home for Pamela Benson's son, Joseph Benson. Heltsley cared for Joseph during the day, Monday through Friday. Heltsley was paid $40 every week for her services. Heltsley also provided child care services for another child, Sabrina, on a part-time basis. Heltsley would care for Sabrina during the morning and take her to school in the afternoon. Heltsley received $40 every other Friday for these services. In addition to these two children, Heltsley also cared for her own child.

This case arose out of a head injury Joseph received while Heltsley was putting all three children in the car so she could take Sabrina to school. Joseph, by and through his parents, sued Heltsley in state court for negligence. At the time of Joseph's injury, Heltsley was covered by a homeowner's insurance policy issued by United States Fidelity & Guaranty Company (U.S.F.& G.) U.S.F.& G. defended Heltsley in the state litigation while reserving its right to disclaim liability coverage.

In federal court, Heltsley filed a declaratory action, asking the trial court to determine that her homeowner's insurance policy covered Joseph's claim made against her. U.S.F.&G. filed a motion for summary judgment, contending that certain policy exclusions precluded coverage of this claim. The policy contained a standard business pursuits exclusion, defining business as a "trade, profession or occupation." The policy also defined home day care as a business pursuit falling within the business pursuit exclusion. It provided:

> " 'If an *insured* regularly provides home day care services to a person or persons other than *insureds* and receives monetary or other compensation for such services, that enterprise is a *business* pursuit. Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an *insured* to a relative of an *insured* is not considered a *business* pursuit.' " 733 F. Supp. at 1421.

Further, the policy included a clause which specifically covered the business activities of minors. It provided: " 'Your Personal Liability (Coverage E) and Medical Payments to Others (Coverage F) coverages are extended to cover the normal business activities of minors. This includes such part-time activities as newspaper delivery, baby sitting, caddying and lawn care.' " 733 F. Supp. at 1421.

Based on these coverages and exclusions, U.S.F.&G. argued that Heltsley's child care services fell within the business pursuits exclusion and that Joseph's negligence claim against Heltsley was not covered by the policy. In response, the appellants argued that Heltsley's child care services were merely "babysitting services," not "day care services"; thus, the appellants argued that the services did not fall into the business exclusion.

In analyzing the motion for summary judgment, the federal district court first pointed to the *Krings* definition of a business activity. The court then applied the test to the facts of the case. The court found that Heltsley's child care services were not irregular or of a limited time or duration because Heltsley took care of Joseph on a daily basis over the course of several months. Further, Heltsley was paid on a regular basis for her services. Her services were motivated by compensation, not by filial or kinship ties. Thus, the federal district court ruled that Heltsley's child care services were continuous and had a profit motive, thereby qualifying as a business activity.

In support of its conclusion, the court pointed to the policy clause which specifically exempted minors' business activities from the business exclusion, stating:

"[The] endorsement accompanying the policy expressly states that the business activities exclusion does not apply to minor babysitting. The endorsement does not provide coverage here, of course, since Heltsley was not a minor at the time of the accident. But the clause is important here, since there would be *no reason to include such an endorsement in the policy unless the business activities exclusion otherwise would include all forms of continuous child care for profit."* 733 F. Supp. at 1421. (Emphasis added.)

Finally, the federal district court made a distinction between " 'day-in, day-out child care for an indefinite period,' and casual babysitting, [consisting of] 'a temporary arrangement for an hour, a day or an evening, for the convenience of parents.' " 733 F. Supp. at 1423 (quoting *Stanley v. American Fire & Cas. Co.*, 361 So. 2d 1030, 1032-33 [Ala. 1978]). According to the court, day-in and day-out child care services would fall into the business exclusion while casual, temporary babysitting would not. The court held that the type of child care services provided by Heltsley was of the former type. Thus, Heltsley's child care services fell into the business exclusion, and Joseph's claim against Heltsley was not covered by the homeowner's insurance policy. As such, the federal district court granted U.S.F.&G.'s motion for summary judgment. 733 F. Supp. at 1423.

Based on the above cases, both parties seem to agree that the casual, temporary babysitting arrangement for an evening or a day

for the convenience of the parents does not fall into the business exclusion, even if the babysitter is paid for his or her services. See *Heltsley*, 733 F. Supp. at 1423. Both parties also seem to agree that the day care center or home that cares for several children on a daily basis as a primary source of income does fall within the business exclusion. See *Susnik*, 14 Kan. App. 2d 421. Thus, the question that both parties ask is: Where on the spectrum of occasional babysitting to professional babysitting do Teri Beck's babysitting services fall?

Both parties cite cases from other jurisdictions which place activities similar to Teri's on one end of the spectrum or the other. See *Farmers Ins. Co. of Arizona v. Wiechnick*, 166 Ariz. 266, 268, 801 P.2d 501 (1990) (finding that an insured who continuously and regularly provided day care services in her home, although only on a temporary basis, fell within her insurance policy's business exclusion because she cared for five children who were not her own for about 7 months, she advertised in the paper, she kept regular hours of 7 a.m. to 6 p.m., Monday through Friday, and she was paid for her services in order to replace income she lost by leaving her previous job outside the home); *MFA Mut. Ins. Co. v. Nye*, 612 S.W.2d 2 (Mo. App. 1980) (finding that a 15-year-old boy who injured a child while mowing his neighbor's lawn was not engaged in a business pursuit because the boy was a full-time student on summer vacation who mowed four lawns over the summer, using the landowner's lawn mower, for $1.25 per hour and this money was not used for self-support); *Hanover Ins. Co. v. Ransom*, 122 N.H. 609, 448 A.2d 399 (1982) (a teenager who mowed lawns 20 hours a week, advertised in the paper, owned his own equipment, had an employee, and took out loans was found to be engaging in a business pursuit); *Allstate Insurance Co. v. Kelsey*, 67 Or. App. 349, 353, 678 P.2d 748, *rev. denied* 297 Or. 227 (1984) (an in-home babysitting arrangement with one family for an average of 14 hours a week, which was only marginally profitable and was motivated by friendship, still fell within a business exclusion because the day care provider also cared for other children [one on a regular basis], she received compensation for babysitting these children, and she advertised in the paper); *Camden Fire Ins. Ass'n*

*v. Johnson*, 170 W. Va. 313, 294 S.E.2d 116 (1982) (finding that an individual who cared for children in her home as a neighborly or kindred accommodation to a friend or relative was not engaging in a "business pursuit" within the meaning of an exclusionary clause in her insurance policy because the individual was not licensed, did not advertise, and was not always compensated for her services). In comparison to the above cases, Teri was a full-time student on summer vacation. She babysat for two siblings away from her home for 2 to 3 days a week. She earned $2 an hour, which is far below the minimum wage, for a maximum total of $65 a week.

While these cases are helpful in reviewing how other states have evaluated the babysitting and business exclusion issue, this case really boils down to whether Teri Beck's babysitting services were more like occasional babysitting or more like professional day care. AMCO contends that her services were more like professional day care because her services satisfied the insurance policy's definition of "business" as being a trade, profession, or occupation. AMCO points to the definition of occupation as "that which principally takes up one's time, thought and energies, especially, one's *regular* business or *employment.*" (Emphasis added.) Black's Law Dictionary 1079 (6th ed. 1990). AMCO argues that Teri was *regularly employed* as a day care provider for the summer months, as other seasonal employees are; thus, day care was her occupation and qualified as a business. See *Union Mut. Ins. Co. v. Brown*, 809 S.W.2d 144 (Mo. App. 1991), *rehearing and/or transfer denied* May 15, 1991 (finding that day care services provided on Tuesday and Thursday, but not on holidays or during illness, and allowed for days to be occasionally shifted, qualified as regular employment).

Further, AMCO contends that the money the Morans paid to Teri for her day care services would constitute "work related child care" costs under the Kansas Child Support Guidelines and could qualify as a child care tax credit on the Morans' income tax returns. AMCO also points out that if Teri had cared for Courtney in Teri's home, then Teri's services would clearly have been excluded under the insurance policy's Home Day Care Business Exclusion. AMCO then argues that the location of the child care services should not

make a difference as to determining whether the services qualify as a business. Thus, according to AMCO, Teri's services should qualify as a business under the business exclusion, regardless of where the child care took place. The Becks argue that Teri's babysitting services were more like occasional babysitting and not a professional babysitting business because her services were exempt from wage and hour laws and child labor laws.

Finally, the parties argue over whether Teri could have bought a separate insurance policy for her babysitting services. Thus, the Becks assert that Teri's services should be covered by her parents homeowner's insurance policy. On the other hand, AMCO points to several homeowner's insurance policies which specifically provide coverage for the occasional and part-time business activities of insureds who are students under age 21 or policies which specifically except such activities from a business exclusion and the definition of business. Since the Becks did not purchase a policy with this type of language, AMCO contends that such activities were not covered and Teri's day care services fell within the business exclusion.

The most relevant argument made by either side is that the determining factor for coverage is whether Teri's babysitting services meet the *Krings* rule and constitute a business or business pursuit.

" ' "To constitute a business pursuit, there must be two elements: first, continuity, and secondly, the profit motive; as to the first, there must be a customary engagement or a stated occupation; and, as to the latter, there must be shown to be such activity as a means of livelihood, gainful employment, means of earning a living, procuring subsistence or profit, commercial transactions or engagements." ' " 6 Kan. App. 2d at 393.

Teri customarily babysat the Moran children on Monday, Wednesday, and every other Friday from 7:20 a.m. to 5:30 p.m. As we compute the dates, Teri would have babysat for the Morans 14 times (at most) prior to the accident. These days occasionally changed, due to the weather or the needs of the Morans, but this was not the custom. Thus, Teri's babysitting activities meet the element of continuity.

However, we agree with the trial court that the record before us does not satisfy the second element under the *Krings* test—

profit motive. It is true that the Morans paid Teri $2 per hour for her babysitting. It also appears that Teri babysat the Moran children for money and not out of friendship or charity. Yet, in adopting the *Krings* test, the Court of Appeals specifically rejected a rule that included as a business pursuit every activity where profit was a motive. Instead, the activity which is motivated by money only qualifies as a business or business pursuit if the activity is a "means of livelihood, gainful employment, means of earning a living, procuring subsistence or profit, commercial transactions or engagements." 6 Kan. App. 2d at 393. Read together, this element indicates that the activity must be a significant source of income. It does not appear that Teri's babysitting services met this test.

Supplemental income derived from part-time activities may satisfy the profit motive element. However, in order for the supplemental income from part-time activities to satisfy the profit motive element, the income must be *capable* of significantly supplementing one's livelihood or subsistence and contributing to one's living requirements. This does not appear to be the case with the money Teri earned from babysitting. Here, Teri's hourly wage was well below the minimum wage. She was not licensed as a day care provider. She did not advertise. The babysitting did not take place in her house and she was a full-time student on summer break. As such, Teri's babysitting services did not qualify as a business activity and did not fall within the insurance policy's business exclusion.

This conclusion is consistent with the fact a reasonable person would not believe that babysitting was the trade, profession, or occupation of this 15-year-old child. We emphasize the test is not what the money is used for, but whether the money is capable, from a reasonable person's point of view, of significantly supplementing one's livelihood. There should be no distinction drawn between a minor with limited income who necessarily must spend the earned money on necessities and a minor who, for whatever reason, is able to use the money for any purpose.

We hold the insurance company did not clearly reveal a purpose to restrict coverage of Teri Beck's babysitting activities. The insurance company could have specifically stated that minors' summer

jobs and away-from-home babysitting are included in the business exclusion if it had wanted to do so.

This conclusion does not mean that all babysitting conducted away from the insureds' home will always fall outside of this type of business exclusion. Instead, each babysitting situation will need to be evaluated individually under the *Krings* test. If the insurance company wants to clarify this issue, it can specifically indicate in the insurance policy that away-from-home babysitting, such as that conducted by Teri Beck, will *not* be covered by the policy, no matter how long it lasts or how little one is paid.

Affirmed.