No. 92,286

MIKE CONNER, *Appellee,* v. OCCIDENTAL FIRE & CASUALTY COMPANY OF NORTH CAROLINA and WILSHIRE INSURANCE COMPANY, *Appellants.*

(135 P.3d 1230)

Opinion filed June 9, 2006.

*Steve R. Fabert*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, argued the cause, and *Teresa L. Sittenauer* and *James P. Nordstrom*, of the same firm, were with him on the briefs for appellants.

*Daniel F. Church*, of McAnany, Van Cleave & Phillips, P.A., of Roeland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Mike Conner filed a claim with his commercial insurers, Occidental Fire & Casualty Company of North Carolina (Occidental) and Wilshire Insurance Company (Wilshire) (collectively insurers), for damages to a farm trailer that collapsed when being loaded with grain. The insurers denied coverage; Conner sued. On cross-motions for summary judgment, the trial court concluded that Conner sustained an insured loss, the insurers failed to conduct a good faith investigation, and Conner was entitled to attorney fees. The trial court set the case for jury trial to determine damages. The jury awarded damages for repairs to the trailer and for loss of use between its collapse and repair.

The insurers appealed. In *Conner v. Occidental Fire & Casualty Co.*, No. 92,286, unpublished decision filed August 5, 2005, the Court of Appeals affirmed in part and remanded with directions. The Court of Appeals affirmed the trial court's determination of liability and coverage under the insurance policy. Slip op. at 11. Concluding that there was a material issue of fact precluding summary judgment, the Court of Appeals remanded for a jury trial on the issue of bad faith of the insurers' investigation. Slip op. at 13. It also remanded for a jury trial on the insurers' contention that Conner fraudulently inflated his claimed loss. Slip op. at 15. The Court of Appeals concluded that there was no coverage for loss of use of the trailer. Slip op. at 14.

Occidental and Wilshire petitioned for review, contending the Court of Appeals misinterpreted the policy in concluding there was coverage for Conner's loss for trailer damages and incorrectly remanded for a jury determination of the issue of bad faith. Conner cross-petitioned for review of the Court of Appeals' conclusions on the questions of bad faith and loss of use of the trailer and of its remand for a jury trial on the question of whether he fraudulently

claimed more than his loss. This court granted both parties' petitions for review.

ISSUES:

INSURERS' PETITION FOR REVIEW

1. DOES THE INSURANCE POLICY PROVIDE COVERAGE FOR THE DAMAGE TO CONNER'S TRAILER?

2. DID THE COURT OF APPEALS ERR IN FAILING TO CONSIDER THE WEAR-AND-TEAR AND MECHANICAL BREAKDOWN EXCLUSION?

3. DID THE COURT OF APPEALS ERR IN REMANDING THE QUESTION OF BAD FAITH FOR A JURY TRIAL?

CONNER'S CROSS-PETITION FOR REVIEW

4. DID THE COURT OF APPEALS ERR IN DECIDING THAT A MATERIAL ISSUE OF FACT PRECLUDED SUMMARY JUDGMENT ON THE QUESTION OF WHETHER THE INVESTIGATION BY DEFENDANTS WAS TIMELY AND ADEQUATE UNDER THE CIRCUMSTANCES?

5. DOES THE INSURANCE POLICY PROVIDE COVERAGE FOR CONNER'S LOSS OF USE OF HIS TRAILER?

6. WAS SUMMARY JUDGMENT PRECLUDED ON THE QUESTION OF WHETHER CONNER FRAUDULENTLY INFLATED HIS LOSS?

FACTS:

On May 22, 2003, the district court filed its order on the parties' cross-motions for summary judgment. On July 17, 2003, on the insurers' motion, the district court amended its judgment. The following findings of fact were made by the district judge in his amended order:

"1. On or about December 22, 1998, plaintiff entered into an insurance contract with Wilshire Insurance Company ('Wilshire') to provide insurance for, among other items, a 1995 Jet Pup trailer.

"2. The insurance contract is between plaintiff and Wilshire. A corporate relationship exists between the two defendants. Representatives of the two defendants were involved in the claim process. Plaintiff was sent a letter dated August 30, 2001, denying his claim that was written on Occidental Fire & Casualty Company of North Carolina ('Occidental') letter head and the denial purported to be

on behalf of Occidental. In addition, Occidental is the 'physical damage supervisor' for Wilshire.

"3. On July 2, 2001, the 1995 Jet Pup trailer was insured under the insurance contract.

"4. Since October 1994, plaintiff has used the trailer to haul farm commodities nearly year-round in and out of hundred[s] of field entrances to market, as well as hauling commodities between grain storage facilities totaling approximately 120,000 miles.

"5. The trailer carries a load of approximately 30,000 pounds of commodity and has a gross weight capacity of 40,000 pounds.

"6. In May, 2001 the frame of the trailer was inspected for cracks by David Hendershott and none were found.

"7. On July 2, 2001, Mr. Anderes was driving a 1991 Kenworth truck which pulled the Jet Pup trailer. Mr. Anderes was assisting plaintiff in the wheat harvest.

"8. Plaintiff and Nathan Anderes, an employee, inspected the truck before using it on July 2, 2001, and did not observe an[y] cracks in the frame·or any other problems.

"9. While Mr. Anderes has been employed by plaintiff it was his opinion that plaintiff maintained his equipment in excellent working condition.

"10. Mr. Anderes drove the truck and trailer into the wheat field where it was to be loaded with a grain cart.

"11. After loading was completed, Mr. Anderes drove the truck and trailer out of the field to a grain elevator six miles away to be unloaded.

"12. There was a motor grader ridge at the entrance to the field. The grader ridge caused the entrance to be uneven with the roadway; consequently, there was a four to six-inch drop-off from the ridge to the roadway.

"13. The first time Mr. Anderes left the wheat field with a loaded trailer, he drove over the grader ridge and was able to feel how it dropped the truck and the trailer. Mr. Anderes did not drive over any other drop-offs while harvesting wheat that day.

"14. No one noticed any problem with the trailer during the first loading, the trip to the elevator or the return trip to the field.

"15. On the return trip Mr. Anderes pulled into the field through the same entrance and the loading process was started again. During the loading process the trailer frame suddenly collapsed.

"16. The damage to the trailer (including the cracks in the frame) occurred when Mr. Anderes drove the loaded trailer over the grader ridge causing the trailer wheels to suddenly drop onto the road surface. (See uncontroverted testimony of Darrell Unrein *infra*.)

"17. On July 3, 2001, plaintiff reported to Wilshire that he had incurred a 'loss' as a result of damage sustained by the trailer.

"18. Plaintiff's insurance contract provides a limit of $10,000.00 for property damage with a $500.00 deductible.

"19. Section III, B., 1. and 3. of plaintiff's insurance contract provides:

'B. EXCLUSIONS

1. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

. . . .

3. OTHER EXCLUSIONS

We will not pay for "loss" caused by or resulting from any of the following unless caused by other "loss" that is covered by this insurance:

a. Wear and tear, freezing, mechanical or electrical breakdown.

b. Blowouts, punctures or other road damage to tires.'

"20. Section IV, A., 1. of plaintiff's insurance contract provides:

'A. COVERAGE

1. We will pay for "loss" to a covered "auto" or its equipment under:

    a. Comprehensive Coverage. From any cause except:

        (1) The covered "auto's" collision with another object; or

        (2) The covered "auto's" overturn.

    b. Specified Causes of Loss Coverage. Caused by:

        (1) Fire, lightning or explosion;

        (2) Theft;

        (3) Windstorm, hail or earthquake;

        (4) Flood;

        (5) Mischief or vandalism; or

        (6) The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

    c. Collision Coverage. Caused by:

        (1) The covered "auto's" collision with another object; or

        (2) The covered "auto's" overturn.'

"21. Section VI [DEFINITIONS], A. of plaintiff's insurance contract provides:

'A. "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".'

"22. Section VI, G. of plaintiff's insurance contract provides:

'G. "Loss" means direct and accidental loss or damage.'

"23. Section VI, L. of plaintiff's insurance contract provides:

'L. "property damage [sic] means damage to or loss of use of tangible property.'

"24. The insurance contract does not define 'wear and tear'.

"25. Defendants denied plaintiff's claim on August 30, 2001.

"26. Prior to their denial of plaintiff's claim, defendants were aware that plaintiff had received damage estimates from David Hendershott of Kohler's Garage, Inc. and Darrell Unrein of Vernie's Trux N Equipment, Inc.

"27. Wilshire's procedure for handling claims (Claim Procedure Manual, Section 3, No. 3.5.3), in part, states:

'This procedure provides continuity in the handling of all claims submitted to the companies.

. . . .

3. Make any necessary telephone calls to obtain additional information to form an accurate picture of the extent of injuries, damages, etc.

4. If the claim is for property damage only, determine if the matter may be handled by telephone, or if an appraiser or adjuster is required.'

"28. Wilshire's procedure for denial of claims (Claim Procedure Manual, Section 3, No. 3.5.2), in part, states:

'This procedure describes the action to be taken in anticipation of denials of coverage and/or liability.

. . . .

3. All coverage question investigations should contain a statement from the insured as well as other parties having knowledge of the question involved.'

"29. Rex Schamberger was the sole person responsible for investigating plaintiff's claimed loss.

"30. On July 26, 2001, Mr. Schamberger and plaintiff met to examine the field entrance and photograph the trailer which was sitting in the field where the trailer collapsed.

"31. Defendants' claim adjuster David Henderson contacted plaintiff and independent claims adjuster Rex Schamberger prior to denying plaintiff's claim; no other contacts were made.

"32. March, 2002, was the first time anyone associated with defendants contacted David Hendershott of Kohler's Garage, Inc. regarding the claimed damage to the trailer.

"33. The uncontroverted testimony of Darrell Unrein concerning his training, experience, inspection of the trailer and expert opinion as to the cause of the damages and resulting loss is:

'1. I am over 18 years of age and live in Hays, Kansas.

2. I am the owner of Vernie's Trux N Equipment, Inc. located in Hays, Kansas.

3. I have over 25 years experience in the repair, inspection and sales of truck trailers similar to Mike Conner's 1995 Jet Pup Trailer.

4. On or about July 25, 2001, I inspected a 1995 Jet Pup trailer owned by Mike Conner after it had been in an accident that occurred on or about July 2, 2001.

5. The damage to the trailer I observed was caused by a sudden impact and the cracks in the frame of the trailer were not stress or fatigue cracks.

6. I have reviewed the attached affidavit of Nathan Anderes and it is my opinion that the damage to the trailer, including the cracks in the frame, occurred when Mr. Anderes drove the trailer over the grader ridge. The damage to the trailer I observed is consistent with the events described in Mr. Anderes' affidavit.

7. The repairs made to the Jet Pup trailer were reasonable and necessary.

8. I was not contact[ed] by any individual affiliated or associated with Wilshire Insurance Company or Occidental Fire and Casualty Company of North Carolina until February 9, 2002. This was the first and only time any individual affiliated or associated with Wilshire Insurance Company o[r] Occidental Fire and Casualty

Company of North Carolina contacted me regarding my opinions as to what caused the damage to the Pup trailer.' "

## DISCUSSION

### INSURERS' PETITION FOR REVIEW

### 1. DOES THE INSURANCE POLICY PROVIDE COVERAGE FOR THE DAMAGE TO CONNER'S TRAILER?

A policy of insurance is a contract. *AMCO Ins. Co. v. Beck*, 261 Kan. 266, 269, 929 P.2d 162 (1996). The interpretation and legal effect of a written contract are matters of law, and an appellate court exercises unlimited review. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001).

When ruling on a motion for summary judgment, the trial court is required to resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. On appeal, this court applies the same rules. *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

The trial court concluded that

"[t]he evidence establishes Mr. Anderes pulled the trailer over the grader ridge causing the trailer wheels to suddenly drop to the road. The sudden drop and impact on the road surface caused the damage including the frame to crack. This was 'direct and accidental loss or damage' which was a loss caused by a 'collision with another object,' the road. See *Canal Insurance Company v. Adams*, 72 Ark. App. 440, 37 S.W.3d 677 (2001); *Harris v. American Casualty Company of Reading*, 83 N.J.L. 641, 85 A. 194 (1912); and cases cited in the respective opinions. See also, *Welch v. Western Casualty and Surety Company*, 567 S.W.2d 743 ([Mo. App.] 1978)."

The trial court further concluded that "[t]he evidence excludes wear and tear as the cause of the frame failure, an exclusion under the policy." And "[a]ccordingly, defendants are in breach of the insurance contract with plaintiff and plaintiff is entitled to recover his damages."

The Court of Appeals affirmed the district court's entry of summary judgment on the question of coverage. Slip op. at 11. The

reasoning of the Court of Appeals is not clear. Although it determined that "[t]he facts of when the damage occurred to the trailer are in dispute," slip op. at 5, the Court of Appeals seems to have concluded that summary judgment was not precluded, in whole or in part, because the insurers had not timely controverted Conner's affidavits of Anderes and Unrein. Slip op. at 10-11.

The insurers assert that they controverted the affidavits. Examination of the broad record references furnished by defendants shows that they questioned the relevance of statements in the affidavits without controverting them and certainly without providing a concise summary of conflicting testimony or evidence, as required by Supreme Court Rule 141(b) (2005 Kan. Ct. R. Annot. 205). The insurers' response to Conner's motion for summary judgment stated, in pertinent part:

"Despite Mr. Anderes's statement that he felt the trailer drop as it exited the field for the first time on the day in question, his statement does not provide any evidence that the damage to the trailer occurred in that particular instant. . . .

". . . [D]espite Mr. Anderes's statement that the trailer dropped as it exited the field for the first time on the day in question, his statement does not provide any evidence that the damage to the trailer occurred in that particular instant. . . . Further, his statement does not indicate any knowledge of a collision between the trailer and any other object. . . . The Unrein Affidavit cited to is conclusory. . . .

"The Unrein Affidavit cited to is merely conclusory and without basis.

". . . Mr. Anderes is only speaking to how the drop off of the grader ridge 'felt' as the trailer was pulled out of the field and over the edge. . . . This is subjective and conclusory. He obviously did not think anything was damaged at that point.

". . . [T]his is a subjective observation of Mr. Anderes and is conclusory. . . .

". . . The Unrein Affidavit cited to is merely conclusory and without basis."

The Court of Appeals correctly concluded that the insurers did not controvert the affidavits presented by Conner.

The insurers also argue the affidavits do not establish that a collision within the meaning of the policy caused the damage to Conner's trailer. The insurers point to the absence of any discussion in the Court of Appeals' opinion of whether or what object collided to cause the damage, and they cite cases from other jurisdictions for the proposition that an impact between a vehicle and the ground is not a collision as a matter of law.

For example, they cite *New Jersey Ins. Co. v. Young*, 290 F. 155 (9th Cir. 1923), but the circumstances in that case are not like those in the present case. In *Young*, the front axle of insured's car, which had been defective, cracked, and substantially weakened for some time, broke and plowed into the road causing the car to pivot on the broken axle and turn over. The Ninth Circuit Court of Appeals determined that there was no coverage for the damage to Young's car:

"But we are unable to construe the word 'collision' as including damage caused by the striking of the car upon the roadway after the defective axle broke and let the car down. It did not come in contact with any object upon the road or roadway until after the defective axle broke . . . . [W]e think the language of the contract, when accorded the ordinary and usual meaning that should govern, does not extend to the incident under consideration, where the proximate cause was the breaking of the defective axle, and damage was not by 'being in accidental collision' with an object." 290 F. at 156.

In *Young*, the inceptive occurrence was the breaking of the axle, which caused the car to overturn; in the present case, the inceptive occurrence was the impact of the trailer upon the roadway.

In *Hirschman v. State Farm Life and Cas. Co.*, 729 F. Supp. 655, 656 (S.D. Iowa 1990), the insureds' "combine became disabled when its final drive broke, causing one of its tires to be loosened from its axle. The combine came to a stop on top of its right front tire, with the other three wheels still in contact with the roadway." The federal district court concluded that there was no coverage for the resulting damage because "a single object, like the combine here, cannot collide with itself" and "the incident falls squarely within the exclusion for mechanical breakdowns." 729 F. Supp. at 657. In *Hirschman*, as in *Young*, the inceptive occurrence was the breaking of a mechanical component.

In *Bell v. American Insurance Co.*, 173 Wis. 533, 534, 181 N.W. 733 (1921), the policy insured against damage resulting to the automobile from " 'being in accidental collision . . . with any other automobile, vehicle, or object.' " There was no coverage for damages resulting from the insured car's gradually settling into the ground and tipping over. The court concluded that the forcible contact of the automobile with the ground as a result of the upset

did not constitute a collision: "In popular understanding a collision does not result, we think, from the force of gravity alone." 173 Wis. at 736. In the present case, the force of gravity was not alone in causing the damage—a grader ridge lifted the trailer above the level of the roadway and, when the trailer dropped from the ridge, there was a sudden impact with the road. In any event, there would have been no issue of coverage had the policy at issue in the present case been in effect for Bell's car. The policy at issue provides coverage for "[t]he covered 'auto's' overturn."

In *Alexander v. Home Ins. Co.*, 27 Hawaii 326 (1923), the insured car was damaged when it tipped over as the driver braked suddenly to avoid a horse that dashed onto the road. The policy insured against damage caused by accidental collision with any object, and the court concluded that there had been no collision. 27 Hawaii at 330-32.

The district court cited a vintage case with a result opposite of that in *Alexander*. In *Harris v. American Cas. Co.*, 83 N.J. (54 Vroom) 641, 646-47, 85 A. 194 (1912), the New Jersey Court of Errors and Appeals concluded that a collision with the earth was covered. The insured car crashed through the guard rail on a bridge, left the bridge, and came to rest upside-down on the bed of the stream. The policy covered loss from "collision with any moving or stationary object." 83 N.J. (54 Vroom) at 643. The New Jersey court believed that the car had been involved in three collisions—with the guard rail, the water of the stream, and the earth at the bottom of the stream. 83 N.J. (54 Vroom) at 644.

Another case cited by the district court to support its conclusion that damage to the trailer from the sudden drop and impact on the road surface was covered under the policy as "direct and accidental loss or damage," which was a loss caused by a "collision with another object," is more closely on point than any of the cases cited by the insurers. In *Canal Ins. Co. v. Adams*, 72 Ark. App. 440, 37 S.W.3d 677 (2001), the question before the court was whether a collision with another object occurred when an insured trailer sustained damage as a result of traversing a set of railroad tracks. The court gave "effect to the plain wording of the insurance policy" and concluded that the loss was covered because "the damage to the

trailer was occasioned by a collision with an object." 72 Ark. App. at 442.

The district court also cited *Welch v. Western Cas. & Sur. Co.*, 567 S.W.2d 743 (Mo. App. 1978). An insured dump truck was damaged while the driver attempted to maneuver the truck across a large hole. "Either as the truck went in, or was coming out of the hole, the frame of the truck broke on both sides, directly behind the cab." 567 S.W.2d at 744. The insurer argued that the "loss was not the result of a 'collision with another object.'" 567 S.W.2d at 745. The Missouri Court of Appeals found no error in the trial court's finding that "there was a 'collision'" because the driver had testified the frame collapsed when the truck struck "'the other side' of the hole." 567 S.W.2d at 745. Under the facts in this case, the district court was correct in concluding that the damage to Conner's trailer was covered under the policy.

## 2. DID THE COURT OF APPEALS ERR IN FAILING TO CONSIDER THE WEAR-AND-TEAR AND MECHANICAL BREAKDOWN EXCLUSION?

In their petition for review, the insurers complain that the Court of Appeals failed to address the application of the wear-and-tear and mechanical breakdown exclusion. But in their reply brief, the insurers state:

"On page 5 of the Brief of Appellant [sic—should be Appellee] it is erroneously stated that the reason for denying the claim was an exclusion for wear and tear. The denial letter plainly states instead that the claim was being denied because the damage did not result from a collision or from any other covered cause of loss."

In fact, the denial letter hedges bets. The denial letter in the record states both that there was no damage due to a collision and that the damage comes within an exclusion:

"We have now completed our investigation into this matter and find that the damage in question would not be covered under your policy of insurance.

"There was no damage to any part of the trailer caused by a collision or any other specified peril. There was no specific incident that would have caused this damage. We realize that this trailer was inspected on May 10, 2001 and it showed no frame damage. However, the loss was reported seven weeks later with no specific occurrence noted.

"We call your attention to your Motor Carrier Coverage Form under Section IV PHYSICAL DAMAGE COVERAGE.

"B. EXCLUSIONS

3. We will not pay for 'loss' caused by or resulting from any of the following unless caused by other 'loss' that is covered by this insurance:

a. Wear and tear, freezing, mechanical or electrical breakdown.

b. Blowouts, punctures or other road damage to tires.

"Based on the above exclusion, we find that we will be unable to consider any payment relevant to this particular loss."

We note that in their answer to Conner's petition, the insurers answered that "the denial letter speaks for itself" and stated that the policy "provides no coverage" and that it "excludes coverage." Thus, although the insurers plainly denied coverage in part on the basis of the exclusion, they denied asserting the exclusion in their reply brief in the Court of Appeals. They are in no position to claim error on the part of the Court of Appeals for failing to address the application of the wear-and-tear and mechanical breakdown exclusion.

### 3. DID THE COURT OF APPEALS ERR IN REMANDING THE QUESTION OF BAD FAITH FOR A JURY TRIAL?

The trial court concluded:

"5. Defendants failed to conduct a good faith investigation into plaintiff's claim as shown by violation of defendants' claims investigation procedures, the failure to interview the two individuals who had inspected the trailer and who had provided plaintiff with repair estimates and the slow pace of the investigation.

"6. Accordingly, defendants are liable for damages to the trailer and for their bad faith failure to properly and timely investigate plaintiff's claim. Plaintiff is entitled to attorneys' fees pursuant to K.S.A. 40-256 for their bad faith and vexatious refusal to pay."

The insurers argued to the Court of Appeals that "the trial court erroneously concluded defendants acted in bad faith by failing to investigate Conner's insurance claim." Slip op. at 12. The Court of Appeals reasoned and ruled:

"The issue of whether there was bad faith in investigating the collapse is primarily one of fact to be determined by the trial court on the basis of the facts and circumstances of each case. Judicial discretion is abused only when the action is arbitrary or unreasonable. *Knuth v. State Farm Mut. Auto. Ins. Co.*, 30 Kan. App. 2d 184, 185, 41 P.3d 287 (2000).

. . . .

"Conner's motion alleged the defendants' investigation prior to the denial of his claim consisted of only contacting him and Schamberger. That is essentially correct; however, on the basis of what Conner told Schamberger, was anything more required of the defendants at that point in time? We believe there is a material issue of fact on whether the investigation by defendants was timely and adequate under the circumstances that existed when the claim was denied. Therefore, it is not an issue that should have been disposed of by the trial court on summary judgment and we remand this case for a jury trial on this issue." Slip op. at 12-13.

Conner, as well as the insurers, also complains of the Court of Appeals' ruling. Conner's complaint will be discussed later as Issue 4 of this opinion.

Occidental and Wilshire contend that the issue of bad faith is not subject to a factual determination by the jury and that the issue of bad faith is not subject to an abuse of discretion standard of review. In the procedural posture of the present case, they are correct on both counts.

On the question of an award of attorney fees, a determination of whether an insurer has refused without just cause or excuse to pay the full amount of such loss is required. K.S.A. 40-256 provides in pertinent part:

"That in all actions hereafter commenced, in which judgment is rendered against any insurance company. . . , if it appear from the evidence that such company . . . has refused without just cause or excuse to pay the full amount of such loss, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such action, including proceeding upon appeal, to be recovered and collected as a part of the costs."

It is well established that "[w]hether an insurer has refused without just cause or excuse to pay the full amount of the insured's loss is a question for the district court as the trier of the facts to determine. *Koch, Administratrix v. Prudential Ins. Co.*, 205 Kan. 561, Syl. ¶ 1, 470 P.2d 756 (1970)." *Sours v. Russell*, 25 Kan. App. 2d 620, 630, 967 P.2d 348 (1998), *rev. denied* 267 Kan. 890 (1999).

On the question of the standard of review, the insurers offer no authority for a standard other than abuse of discretion. The Court of Appeals has stated that where the authority of the trial court to award fees is not at issue, an abuse of discretion standard of review

is proper: "We review the trial court's decision regarding attorney fees based upon the abuse of discretion standard. [Citation omitted.]" *Knuth v. State Farm Mut. Auto. Ins. Co.*, 30 Kan. App. 2d 184, 185, 41 P.3d 287 (2000). The issue of the trial court's authority to award attorney fees, however, is a question of law, and appellate review is unlimited. See *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998). The issue of the reasonableness of the amount of attorney fees awarded is said to fall within the trial court's discretion, *Hawkins v. Dennis*, 258 Kan. 329, 349, 905 P.2d 678 (1995), and to require the interpretation of a statute, which is a question of law with unlimited review. *Moore v. St. Paul Fire Mercury Ins. Co.*, 269 Kan. 272, 274, 3 P.3d 81 (2000). In the present case, the issue is the determination of whether the insurers refused without just cause or excuse to pay Conner's loss. Following the case law that has come to the court's attention, the court would apply an abuse of discretion standard to this issue if this case had been tried.

The case was appealed, however, from the entry of summary judgment. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

Applying the above standard, we conclude that there is no genuine issue as to any material fact, and Conner is entitled to judgment as a matter of law. The district court made the factual bad faith determination, and the Court of Appeals erred in holding the

jury must make that determination. The Court of Appeals also erred in applying an abuse of discretion standard in reviewing the district court's determination.

## CONNER'S CROSS-PETITION FOR REVIEW

4. DID THE COURT OF APPEALS ERR IN DECIDING THAT A MATERIAL ISSUE OF FACT PRECLUDED SUMMARY JUDGMENT ON THE QUESTION OF WHETHER THE INVESTIGATION BY DEFENDANTS WAS TIMELY AND ADEQUATE UNDER THE CIRCUMSTANCES?

The trial court determined that the insurers refused without just cause or excuse to pay the amount of Conner's loss. The Court of Appeals disagreed, stating:

"Conner's motion alleged the defendants' investigation prior to the denial of his claim consisted of only contacting him and Schamberger. That is essentially correct; however, on the basis of what Conner told Schamberger, was anything more required of the defendants at that point in time? We believe there is a material issue of fact on whether the investigation by defendants was timely and adequate under the circumstances that existed when the claim was denied. Therefore, it is not an issue that should have been disposed of by the trial court on summary judgment and we remand this case for a jury trial. . . ." Slip op. at 12-13.

The trial court concluded that the insurers "failed to conduct a good faith investigation into plaintiff's claim as shown by violation of defendants' claims investigation procedures, the failure to interview the two individuals who had inspected the trailer and who had provided plaintiff with repair estimates and the slow pace of the investigation." The Court of Appeals questioned whether it was necessary for the insurers to follow their claims investigation procedures and interview the persons who had inspected the trailer and to proceed apace in light of "what Conner told Schamberger." Slip op. at 12-13. What Conner told Schamberger, according to the Court of Appeals, was the following:

"On July 26, 2001, Schamberger took a statement from Conner over the telephone in which Conner explained that the trailer had been loaded and driven to town where it was unloaded. According to Schamberger, Conner stated:
'And we were going in and out of a field that had a ditch in it that we did numerous times before. We were going in and out of it with other trucks. And when it got

back we had a grain cart full of grain. We loaded the trailer and the frame broke—or the trailer or just dropped. And evidently prior to that the frame had cracked going through these draws that we go in and out of these fields with.'

"When asked what he thought caused the damage to his trailer, Conner responded: 'Well, I think the twisting of the going in and out of the fields. I would say that is what I believe caused it.' Conner did not tell the investigator who had been driving the truck when the problem occurred. In his statement to Schamberger, Conner continued to use the word, 'we,' indicating that he was present when the trailer was being used. When Schamberger submitted his report to defendants, he stated that he thought the collapse of the trailer was contributed to by wear and tear. After receiving Schamberger's report, defendants sent a letter to Conner on August 30, 2001, denying his claim based on the policy exclusions." Slip op. at 6-7.

The trial court found that "[p]rior to their denial of plaintiff's claim, defendants were aware that plaintiff had received damage estimates from David Hendershott of Kohler's Garage, Inc. and Darrell Unrein of Vernie's Trux N Equipment, Inc."

The Court of Appeals' conclusion on this issue was based on the ground that a material issue of fact precluded summary judgment. The material issue, according to the Court of Appeals, was whether defendants' investigation was timely and adequate under the circumstances. The Court of Appeals suggested that defendants' investigation may have been timely and adequate in the circumstances because the insurers may have been relieved from following their own claims investigation procedures, which would have included interviewing persons who had inspected the trailer, by the insured's telling Schamberger he thought "the twisting of the going in and out of the fields" caused the damage to his trailer. As the trial court noted however, the insurers' written claim procedures rule out denying a claim solely on the basis of the insured's statement: "Action to be taken in anticipation of denials of coverage" includes statements from the insured "as well as other parties having knowledge of the question involved." With the insurers' procedures requiring the investigator in this case to obtain statements from Hendershott and Unrein in addition to the insured, the investigator's action in obtaining a statement only from the insured is not a ground for reversing the district court. As the trial court concluded: "Defendants failed to conduct a good faith in-

vestigation into plaintiff's claim as shown by violation of defendants' claims investigation procedures, the failure to interview the two individuals who had inspected the trailer and who had provided plaintiff with repair estimates and the slow pace of the investigation." The district court did not commit error in granting Conner's motion for summary judgment.

## 5. DOES THE INSURANCE POLICY PROVIDE COVERAGE FOR CONNER'S LOSS OF USE OF HIS TRAILER?

Consistent with the jury's verdict on damages, the trial court entered judgment in the following amounts:

| | |
|---|---|
| "Damages to personal property | $4,192.89 |
| Damages for loss of use of the personal property | $5,338.50 |
| TOTAL JUDGMENT | $9,571.39." |

The Court of Appeals' discussion of this issue in its entirety follows:

"Defendants rely upon the following language in the insurance policy:

### 'C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one "accident" is the lesser of:
1. The actual cash value of the damaged or stolen property as of the time of "loss"; or
2. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.'

"When Conner testified about the damages he sustained for the loss of the trailer's use, the defendants objected, claiming that loss of use was not the same as business profits and neither were covered under the insurance policy. The insurance policy is clear as to the exclusions in its limits of insurance. The policy does not cover lost profits, and the trial court erred in finding that it did." Slip op. at 13-14.

The limits provision the Court of Appeals focused on to the exclusion of all others is a familiar one that allows the insurer to pay the cash value of a vehicle or other piece of personal property if the estimated repairs exceed the cash value of the damaged property. As the trial court noted, the policy defined "loss," which is what the limits provision applies to, as "direct and accidental loss or damage." Direct loss or damage would not include consequen-

tial damages such as loss of use damages. See *State ex rel. Stovall*, 278 Kan. at 790-92. Hence, on its face, the limits provision quoted by the Court of Appeals would not seem to apply so as to exclude loss of use damages.

All pertinent provisions of an insurance policy must be considered together and given effect. Where the provisions of a policy are susceptible of more than one construction, the construction most favorable to the insured prevails. *Brumley v. Lee*, 265 Kan. 810, 813-14, 963 P.2d 1224 (1998). The Court of Appeals improperly isolated one policy provision from the others and then misread it. Considered together, the provisions of Conner's policy appear to provide recovery for the loss of use of his trailer. But, if the provisions pertinent to this issue are ambiguous, that ambiguity must be construed in Conner's favor.

In his cross-petition for review, Conner complains that the Court of Appeals failed to take into account *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 49, 519 P.2d 667 (1974), which the trial court referred to in overruling the insurers' motion for judgment notwithstanding the verdict. The insured's position is that the Court of Appeals erred in restricting its analysis to the terms of the policy because *Venable* provides a noncontractual basis for awarding loss of use damages. Since we have concluded that there is a contractual basis for an award of loss of use damages, we need not consider *Venable*.

## 6. WAS SUMMARY JUDGMENT PRECLUDED ON THE QUESTION OF WHETHER CONNER FRAUDULENTLY INFLATED HIS LOSS?

In the Court of Appeals, the insurers argued that Conner misrepresented the loss in his petition and in the affidavits attached to his motion for summary judgment. They contended that his inflating the loss constitutes a fraudulent insurance act within the meaning of K.S.A. 40-2,118(a), which excuses an insurer from providing coverage or paying any claim involving a fraudulent insurance act under K.S.A. 40-2,118(c).

With regard to the affidavits offered by Conner in support of his motion for summary judgment, the insurers stated they "were

clearly sham documents whose contents are directly contrary to the sworn testimony of both Mr. Conner and Mr. Unrein. Mr. Conner admitted at trial that the repair estimates he submitted to his insurance company were knowingly inflated, and exceeded the actual cost of repair." Examination of the record on appeal shows that neither of the affidavits submitted with Conner's motion for summary judgment address the cost of repairs. One affidavit is from Anderes, who was driving the truck the day the trailer collapsed. It describes the events of July 2, 2001. The other is from Darrell Unrein, which was previously quoted in full in the trial judge's findings of fact No. 33. Unrein mentions no loss figure.

In his petition, Conner prayed for damages "in the amount of $15,000 for the cost of repair to the trailer *and for lost revenue resulting from the loss of the trailer during defendant's delayed investigation.*" (Emphasis added.) The damage figures presented to the jury during the damages phase of the proceedings were $10,667 for loss of use of the trailer and $4,192.89 for repairs to the trailer for a total of $14,859.89. Based on the facts presented, the $140.11 difference between $15,000 and $14,859.89 does not appear to be a fraudulent act and, if it were, it would hardly seem to be the sort of fraudulent insurance act the legislature intended to void coverage or deny payment. The Court of Appeals realized that the insurers misrepresented what Conner prayed for in his petition and rejected the insurers' argument on that basis. Slip op. at 15.

Apparently in response to Conner's statement that the repairs he had done cost less than what had been estimated, the Court of Appeals went beyond what the insurers had argued:

"Conner paid Kohler $2,754.89 for the repairs to the trailer. Later, Conner paid Warren Sandblasting $1,438 for sandblasting and painting. The total amount Conner paid for the repairs to the trailer was $4,192.89.

"Whether Conner knowingly, and with the intent to defraud, presented the defendants with a cost estimate, rather than the bill for the actual repairs to support his claim for damages, is a question of fact that requires determination by the trier of fact. It is an issue that cannot be decided on summary judgment, and the case is remanded to the trial court for a jury trial on this issue." Slip op. at 15.

There is no question that this issue needs to be determined on remand. First, the repair estimates were obtained by Conner and submitted to the insurers before they denied coverage. After the insurers denied coverage, Conner had repairs made to the trailer. The actual cost of repairs was then sought from the insurers. At the damages phase of the proceedings, Conner explained that the out-of-pocket repairs he made to the trailer were less costly than the repairs he received estimates for because the repairs did not restore the trailer to its former condition:

"Q (By Mr. Church) What did you do, Mr. Conner, after the insurance company informed you that they were denying your claim after they took some pictures of the pup trailer and, I guess, took a phone statement?

"A Well, I was in North Dakota at this particular time. And I—my mom give me the news over the telephone. And I was a little upset about it. But I ended up calling Joe Kohler and told him that if there was any way he could fix that trailer other than the estimate, that I really couldn't afford to fix it that way.

"Q Okay.

"A So, he did the best he could to cheapen it up and get it on the road.

"Q Okay. So you asked Mr. Kohler to repair the trailer, but not—but if he could eliminate some costs on that estimate—

"A Right.

"Q —that you wanted him to do so?

"A Right.

"Q Because you were paying for it out of your own pocket?

"A Yes.

"Q And Exhibit 21, that's an invoice from Mr. Kohler for the repairs, correct?

"A Yes.

"Q And that totaled how much?

"A [$]2754.89.

"Q That was certainly less than his repair total of [$]7,128.80, right?

"A Quite a lot.

"Q Okay. Do you know what he did differently to repair your pup trailer versus the invoice compared to his original estimate?

"A He repaired the back beam in the trailer, plated it rather than replaced it, and straightened it out; welded the cracks back. He removed the back frame, put a double frame in. And when he got that out and put it back in place, the front kind of went back in place, so he plated the top of the front frame.

"Q He plated—what was he going to do based on the original estimate?

"A Replace it.

"Q Okay. And replaced the back beam on the trailer, but he plated it with heavier plate.

"Q What about some of the damage on the corners that we've looked at in the pictures?

"A He had to fabricate some pieces for some of that. I don't know exactly just what all he did.

"Q Instead of replacing it?

"A Yeah.

"Q So you had him do some repair work that was other than the estimate and that was okay?

"A Yeah.

"Q To get your trailer back working?

"A Right."

The record does not support the insurers' claim that Conner committed a fraudulent act which would excuse the insurers from paying the claim. The district court correctly held that K.S.A. 40-2,118 was not applicable.

Judgment of the Court of Appeals is affirmed in part and reversed in part. Judgment of the district court is affirmed and remanded.

NUSS, J., not participating.