FILED
United States Court of Appeals
Tenth Circuit

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**February 9, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

BRANDON STEVEN MOTORS, LLC,

    Plaintiff - Appellant,

v.

LANDMARK AMERICAN INSURANCE
COMPANY,

    Defendant - Appellee.

No. 22-3192
(D.C. No. 2:19-CV-02659-HLT)
(D. Kan.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **BACHARACH**, **McHUGH**, and **MORITZ**, Circuit Judges.

_____

Appellant, Brandon Steven Motors, LLC ("BSM"), brought this action against its

insurer, Appellee, Landmark American Insurance Company ("Landmark"), seeking

payment of its claims arising from a severe hailstorm. BSM owns car dealerships in

Wichita, Kansas, and purchased a "Dealer's Open Lot Coverage" insurance policy (the

"Policy") from Landmark. On May 5, 2019, a hailstorm damaged several hundred of

BSM's vehicles. BSM submitted a claim, and Landmark hired Expert Auto Claims

("EAC") to inspect the vehicles and assess the damage. BSM hired USA Dent to repair

_____

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and
Tenth Circuit R 32.1.

the damaged vehicles and to assist in the claims process. On June 24, 2019, EAC sent Landmark a spreadsheet detailing the claim total for each vehicle as well as the net amount available after consideration of the insurance deductible and loss from an earlier storm, resulting in a total of $2,300,949.19. With Landmark's permission, EAC shared the spreadsheet with BSM, and BSM agreed the numbers were acceptable. While this assessment was occurring, USA Dent was repairing BSM's vehicles. BSM paid USA Dent an initial amount of $150,000 and agreed to pay USA Dent 50% of the insurance proceeds.

After receiving the spreadsheet from EAC, BSM reached out to Landmark asking when the claim would be paid. Landmark stated that it was still investigating BSM's claim, and then sent BSM a reservation-of-rights letter, retained counsel, and sent BSM a document request letter. In response, BSM filed suit in the District of Kansas on October 25, 2019, alleging one count of breach of contract and one count of breach of the duty of good faith and fair dealing.

Landmark moved for summary judgment, and the district court granted the motion, concluding the contract did not require that Landmark pay the $2.3 million figure detailed in the spreadsheet. The court explained that the Policy limited BSM to recovery of the "actual cost" to repair the vehicles and that, even if the Policy did not so limit the recovery, nothing in the agreement entitles BSM to recover the $2.3 million in the spreadsheet. As a result, BSM could not succeed on either of its claims.

BSM appeals, requesting that we reverse the district court's grant of summary judgment. Because we conclude that BSM has raised a genuine dispute of material fact, we reverse and remand this case for further proceedings.

## I.       BACKGROUND

### A.       *Factual History*

**1.       BSM's Open Lot Coverage Insurance Policy**

BSM owns dealerships in Wichita, Kansas, with hundreds of vehicles for sale on open lots. BSM purchased a "Dealer's Open Lot Coverage" insurance policy from Landmark with a $2.5 million limit, effective August 31, 2018, to August 31, 2019. BSM paid Landmark $1,452,465 for the premium and fees.

Section III of the Policy states: "The coverage afforded hereunder is 'loss' caused by or resulting from 'Collision' and 'Comprehensive' including 'Flood', 'Earthquake', Trick and Device and False Pretense, Theft, and Transit." App. Vol. 1 at 160. The Policy provides, with our emphasis:

> "Comprehensive" shall be defined as **"loss" caused by or resulting from damage to a covered "automobile" from** any external cause except as other [*sic*] otherwise excluded or "loss" caused by "collision" of the "automobile". Breakage of glass and "loss" caused by missiles, falling objects, fire, theft, explosion, "earthquake", **windstorm**, **hail,** water, "flood", vandalism, riot or civil commotion shall not be deemed 'loss' cause by "collision" or upset.

*Id.* at 157. "Loss" is defined as "accidental, external, direct physical destruction, theft or damage to a covered 'automobile.'" *Id.* at 159.

Section IX.4. of the Policy, titled "Payment of Loss" provides:

> The Company at it's [*sic*] sole option may pay for the loss in money or may repair or replace the damaged or stolen unit or part thereof but if requested

3

by the Company, the Insured shall replace such unit or part thereof or furnish the labor and materials necessary for repairs thereto and the Company shall pay only the actual cost to the insured. The Company may, at any time before the loss is paid or the unit [i]s so replaced, at their expense return any stolen unit to the Insured, with payment for any resultant damage thereto to or may take all or part of the damaged or stolen unit at the agreed or appraised value but there shall be no abandonment to the Company.

The loss shall not become payable unless, as a condition precedent to liability, there shall have been full compliance with all the terms and conditions of this policy and in any event payment shall not be made until thirty (30) days after verified proof of loss shall have been received by the Company and if an appraisal is demanded then not until thirty (30) days after an award has been made by the appraiser.

*Id.* at 167. Accordingly, Landmark had the option to pay the loss, to repair or replace the damaged vehicles, or to request that BSM furnish the repairs and recover its actual costs in doing so. The Policy goes on to describe how loss will be calculated if the vehicles are repaired.

Section X of the Policy is titled "Basis of Loss Settlement and Adjustment" and states in relevant part:

In the event of a partial "loss" to any "automobile" insured hereunder **which is not settled on an appearance damage basis**, "We" will calculate settlement as follows:

Labor rates will be calculated as ninety percent (90%) of participating dealer's customary insurance labor rates. Parts, paint and any other materials will be calculated at seventy-five percent (75%) of participating dealer's customary retail cost. If the participating dealer subcontracts all or part of the repairs to a repair facility in which they, their officers, shareholders or employees have no financial interest, 'We' will make settlement at the cost to the participating dealer, subject to this rate being approved by "Us".

*Id.* at 169 (emphasis added). Where the claim is settled on an appearance damage basis, the Policy provisions detailing the calculation of labor rates for repairs are expressly inapplicable.

### 2.    Damage to BSM's Inventory and Investigation

On May 5, 2019, a hailstorm occurred in Wichita. Several hundred vehicles on BSM's lot were damaged in the storm. On May 6, 2019, Tim Bishop of BSM submitted a claim and inventory list of the vehicles damaged by the hailstorm to Landmark. Dan Durbin of Landmark was assigned the claim.

Mr. Durbin retained EAC "to visually inspect all of the vehicles that [were] being claimed, to let [him] know what caused the damage, and the scope of damage, as well as taking photos, writing estimates, and generally assisting the insured with the process." App. Vol. 4 at 905. BSM hired USA Dent to repair the damaged vehicles and help in the claim process. The exact date on which BSM hired USA Dent is not clear from the record, but Landmark asserts that BSM hired USA Dent the day after the storm, and BSM represents that USA Dent was working on its vehicles in May and June 2019. EAC inspected the damage to BSM's inventory from May 7 through May 17, 2019. It is undisputed that Landmark never requested that BSM repair the damaged vehicles. The parties also agree that EAC and USA Dent jointly inspected the damaged vehicles.

On June 4, 2019, EAC sent a two-page report to Mr. Durbin of Landmark. Per that report, "[t]he initial assignment involved loss damage to the vehicle inventory of Brandon Stevens Motors and Eddy's Motors, LLC, Chrysler Jeep Dodge located in Wichita, KS." App. Vol. 8 at 1870. The report found that "[d]amage to the dealer inventory comes in

5

the form of severe weather resulting in wind and hail damage to most panels," and that "[p]arts were replaced as needed and panels were repainted as needed." *Id.* at 1871. The report explained that hail damage "was estimated using the standard pricing grid used by most major insurers for Paintless Dent Repair and the Audatex Estimating System for conventional repair" and that "[a] 10% labor discount and a 25% parts discount were applied." *Id.*

Mr. Durbin then hired G4S, an investigative unit "with specialized experience in investigating fraud." App. Vol. 4 at 908. G4S investigated and submitted a report to Landmark proposing a follow-up investigation. The record and district court's order denying summary judgment for BSM indicate that Landmark rejected this proposal. *See, e.g.*, App. Vol. 8 at 1708 ("G4S's report made some suggestions for additional investigation and stated that an insurance fraud referral to the state was not warranted. Landmark rejected G4S's suggestions for additional investigation.").

On June 24, 2019, Donna Foster of EAC sent Mr. Durbin of Landmark a spreadsheet regarding BSM's loss (the "EAC Spreadsheet"). The EAC Spreadsheet identified the vehicles on BSM's lot, noted the claim total for each vehicle, and listed the amount after consideration of the deductible and loss from an earlier storm. The spreadsheet calculated a total of $2,300,949.19 in losses. On June 25, Mr. Durbin gave Ms. Foster permission to "share this with the insured to see if they agree." App. Vol. 2 at 347; *see also* App. Vol. 5 at 1073. That same day, Ms. Foster emailed the spreadsheet to Mr. Bishop of BSM, stating,

> This store was involved in a loss in February and a loss in May. For the units that were involved in both losses we deducted the loss paid in the February loss from the appraised May 5, 2019 loss. I did not have any information that you repaired any of these units or replaced any parts, but if you have and can provide that information to your insurance carrier they will take that into consideration.

App. Vol. 2 at 346; *see also* App. Vol. 5 at 1072.

Mr. Bishop asked what the next steps were for "getting this claim paid." App. Vol. 5 at 1072. Mr. Durbin responded asking whether Mr. Bishop agreed regarding the latest spreadsheet and informing Mr. Bishop that he "need[ed] one more item from Expert Auto." *Id.* at 1071. Mr. Bishop confirmed that "the numbers are acceptable." *Id.*

### 3.    Repairs to BSM's Inventory

In May and June 2019, USA Dent set up a "workshop" on BSM's lot and began repairing the damaged vehicles with a method known as "paintless dent repair." Mr. Bishop of BSM testified that most of the damaged vehicles had been repaired by late June or early July 2019. BSM represents that, on May 30, 2019, they paid USA Dent $150,000 "because the repair workers 'were getting a little unrest about getting paid.'" Appellant's Br. at 12 (quoting App. Vol. 4 at 826). BSM also represents that when it hired USA Dent, BSM agreed to pay USA Dent 40% to 60% of the insurance proceeds. The parties agree that BSM eventually agreed to pay USA Dent 50% of the insurance proceeds. A representative of USA Dent testified that they reached this agreement in part because USA Dent "[was] not fixing the cars 100 percent," as "the damage was beyond the scope of what paintless dent repair can fix to put a new car back to new." App. Vol. 4 at 1018.

**4.     Dispute Over BSM's Claim**

After agreeing to the EAC Spreadsheet, Mr. Bishop followed up with Landmark on July 1, 2019, to ask whether payment would occur soon. Mr. Durbin responded in the negative and stated that the "investigation continues." App. Vol. 5 at 1109. Landmark was seeking additional information delineating between wind and hail damage, and Mr. Durbin indicated that payment would not take place until the investigation was complete.

On July 3, 2019, Landmark sent a reservation-of-rights letter questioning whether the claimed damages were caused by a covered loss, in part because it was not clear to Landmark that wind speeds had reached sufficient velocity to damage the vehicles. Landmark noted that it "ha[d] concerns about whether BSM ha[d] misrepresented or concealed material facts from Landmark during its investigation of the claimed loss." App. Vol. 2 at 376.

On July 30, 2019, Mr. Durbin informed Mr. Bishop and Brandon Steven that Landmark had retained counsel and was putting together a document request letter. On August 14, 2019, Landmark's counsel sent a letter requesting eleven categories of documents, a sworn statement of loss as provided for in the Policy, and an examination under oath. The list of requested documents included a request for "[a]ll invoices, receipts, proposals, estimates or other documents reflecting any actual repairs of the claimed damages to the vehicles as a result of hail and/or wind on May 5, 2019." App. Vol. 1 at 104. BSM responded on September 6. Regarding the request for documents reflecting the "actual repairs," BSM responded:

Request No. 7 fails to recognize that the policy provides coverage for Actual Cash Value and is not based upon the actual repairs. Regardless, BSM had an oral agreement with USA Dent to make the repairs based upon the spreadsheet created by Expert Auto that Landmark has had in its possession since June.

*Id.* at 213.

USA Dent subsequently created invoices for the repairs to BSM's inventory. BSM represents that Anthony Cope of USA Dent created these invoices by "reviewing paperwork and notes by Dennis Sanders of USA Dent that included the 'digits of a VIN number on a car' and 'dollar amount,' which he cross-referenced to 'match up' with each vehicle." Appellant's Br. at 20. Mr. Sanders testified that the "invoices go back to basically trying to get within a number that was close to what the spreadsheet was sent to [BSM] by the insurance company." Supp. App. Vol. 1 at 168. The district court similarly explained that USA Dent appears to have created these invoices after BSM's dispute with Landmark arose.

## B.    *Procedural History*

BSM filed suit in the District of Kansas on October 25, 2019, alleging one count of breach of contract and one count of breach of the duty of good faith and fair dealing.

BSM filed a motion for partial summary judgment on its breach of contract claim. The district court denied BSM's motion. Landmark then moved for summary judgment on both of BSM's claims. The district court explained "[t]his case ultimately comes down to the interpretation of the insurance policy--a question of law" and granted summary judgment "[b]ecause the policy does not provide for payment based on the estimated cost of repairs when repairs were completed." App. Vol. 8 at 1954. Thus, the court held BSM

9

could not prove the elements of breach of contract because BSM could not show that

Landmark had breached the contract by refusing to pay the $2.3 million provided in the

EAC Spreadsheet. In reaching its conclusion, the court explained that it would "draw[]

largely on its earlier finding of undisputed facts, except to the extent those facts are no

longer relevant, and [would] supplement where new facts have been provided by the

parties." *Id.* at 1955.

The court first found that Section IX.4. of the Policy, titled "Payment of Loss,"

specifically states Landmark will pay only the "actual cost to the insured" in cases such

as this one, where the insured replaces the damaged unit or furnishes the labor and

materials necessary for repairs to the unit. *Id.* at 1963. The court rejected BSM's

argument that this provision does not apply because Landmark did not request that BSM

conduct the repairs, finding that Landmark had not made this request only because BSM

advised Landmark that the repairs had already been conducted.

Next, the district court concluded that, even if the "actual cost" provision of

Section IX.4. did not apply, BSM has not established that it is entitled to payment of the

"estimated cost of repair in the spreadsheet" under the Policy. *Id.* at 1964. The court

rejected BSM's argument that Landmark was obligated to pay the EAC Spreadsheet

amount as a loss that had been settled on an "appearance damage basis," noting the

court's previous factual finding that "there was no agreement that the amount in the

spreadsheet would be paid," and concluding that the parties had clearly not settled the

claim on an appearance damage basis given the present dispute. *Id.* at 1965. The court

then rejected BSM's alternative argument that, if the spreadsheet did *not* represent a

settlement on an appearance damage basis, the spreadsheet amount had been calculated in compliance with the provisions of Section X.A. and thus should be paid.

Because the district court found that BSM has not identified any contractual obligation Landmark violated, and breach of the implied covenant of good faith and fair dealing does not create a contractual obligation where there is none under Kansas law, the court concluded Landmark was also entitled to summary judgment on BSM's claim for breach of the implied covenant of good faith and fair dealing.

BSM timely appealed.

## II.     DISCUSSION

On appeal, BSM argues that the district court erred in concluding Landmark did not breach the Policy and requests that we reverse the order granting summary judgment. This appeal turns on whether Landmark has breached the Policy because it has failed to pay BSM the $2.3 million provided for in the EAC Spreadsheet.[1] BSM argues it is entitled to this amount as "pay[ment] for the loss in money" as provided for in Section IX.D. of the Policy because the EAC Spreadsheet represented an amount "settled on an appearance damage basis" as referenced in Section X.A. BSM further asserts the district court erred in concluding the Policy's provision limiting Landmark's payment to the

---

[1] On appeal, neither party appears to dispute that the damage to BSM's vehicles falls within the scope of Section III and is thus a covered loss under the Policy. The parties instead focus on whether Landmark breached the Policy when it failed to pay the amount provided for in the EAC Spreadsheet. Similarly, in granting Landmark's motion for summary judgment, the district court noted that "BSM is still entitled to pursue a claim for the costs it incurred as a result of the storm, in accordance with the terms of the [P]olicy." App. Vol. 8 at 1970–71.

"actual cost" to BSM applies under such circumstances. Finally, BSM argues that Landmark is not entitled to costs pursuant to Federal Rule of Civil Procedure 54(d)(1), and that BSM is entitled to pursue its right to attorney's fees under Kansas state law.

### A.     Standard of Review

"We review the district court's decision[] on [a] motion[] for summary judgment de novo, applying the same standard as the district court." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *Adamson*, 514 F.3d at 1145 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Utah Animal Rts. Coal. v. Salt Lake Cnty.*, 566 F.3d 1236, 1242 (10th Cir. 2009).

### B.     Legal Standard

The parties agree this dispute is governed by Kansas state law. The elements of a breach of contract claim under Kansas law are: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013).

"Under Kansas law, an insurance policy constitutes a contract, and the interpretation of a contract is a question of law." *BancInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1233 (10th Cir. 2015) (citing *AMCO Ins. Co. v. Beck*, 929 P.2d 162, 165 (Kan. 1996)). However, "[w]hether a contract has been breached is a question of fact." *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 298 P.3d 250, 265 (Kan. 2013).

"The primary rule in interpreting written contracts is to ascertain the intent of the parties." *Liggatt v. Emps. Mut. Cas. Co.*, 46 P.3d 1120, 1125 (Kan. 2002). "If the language in an insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used." *Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 130 (Kan. 2003); *BancInsure, Inc.*, 796 F.3d at 1233 ("Where the language of an insurance policy is clear and unambiguous, we must apply it in its plain and ordinary sense." (citing *Warner v. Stover*, 153 P.3d 1245, 1247 (Kan. 2007))). Our "function is to enforce the contract as made." *Cath. Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992).

"To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Id.*; *see also Liggatt*, 46 P.3d at 1125 ("Ambiguity exists if the contract contains provisions or language of doubtful or conflicting meaning."). "If the language is ambiguous, the construction most favorable to the insured must prevail." *Brumley v. Lee*, 963 P.2d 1224, 1226 (Kan. 1998).

### C.    *Analysis*

The district court rejected BSM's argument that the EAC Spreadsheet represented an amount "settled on an appearance damage basis." In addition, the district court found that Landmark is obligated to pay only the "actual cost of those repairs" to BSM. App. Vol. 8 at 1963. Thus, the court held that BSM had failed to demonstrate Landmark breached the insurance contract by refusing to pay the EAC Spreadsheet amount and failed to provide sufficient evidence of the actual cost of repair. Accordingly, the court granted Landmark's motion for summary judgment.

In reaching this conclusion, however, the district court relied on certain factual findings unfavorable to BSM. Because there exists a genuine dispute of material fact over whether Landmark and BSM agreed to settle this claim on an appearance damage basis, the district court erred in granting summary judgment.

### 1.    **Agreement to Settle on an Appearance Damage Basis**

The term "appearance damage basis" in the Policy is ambiguous. We interpret this ambiguous term in a manner favorable to BSM to mean that the parties have agreed on an amount to settle the claim. We further conclude that there exists a genuine dispute over whether the parties agreed Landmark would pay BSM the amount in the EAC Spreadsheet to settle this claim. This dispute is material to whether Landmark breached the Policy, and thus whether BSM can prevail on its breach of contract claim. Summary judgment is therefore improper.

The term "appearance damage basis" in the Policy is ambiguous because its meaning is doubtful and cannot be gleaned from a natural and reasonable interpretation

14

of the language. *See Raymer*, 840 P.2d at 459. The term is not explained or defined

anywhere in the Policy. Instead, it appears one time, in Section X.A., where the Policy

outlines how a settlement will be calculated "[i]n the event of a partial 'loss' to any

'automobile' insured hereunder *which is not settled on an appearance damage basis*[.]"

App. Vol. 1 at 169 (emphasis added). Rather than providing any guidance on settling a

claim on this basis, the section merely explains how a settlement will be calculated when

a loss has *not* been settled on an appearance damage basis. The term is not used

elsewhere in the Policy. Although Landmark asserts in both its briefing and at oral

argument that the Policy is unambiguous, Landmark does not provide us with any

definition of the term "appearance damage basis."[2]

We interpret the term "appearance damage basis" to "mean[] if the parties can

agree on what the value is of the damage." *See* App. Vol. 3 at 598. BSM proposes this

interpretation on appeal, relying on the testimony of Landmark's Rule 30(b)(6) witness,

Brian Snead. Adoption of BSM's proposed interpretation is appropriate because the term

is ambiguous and, in such cases, "the construction most favorable to the insured must

prevail." *Brumley*, 963 P.2d at 1226. Further, Landmark conceded before the district

---

[2] Landmark concedes that, to the extent there is any ambiguity, it would be construed against Landmark. However, Landmark maintained at oral argument that "there is no ambiguity in the Policy." Oral Argument at 19:12–19:14, *Brandon Steven Motors, LLC v. Landmark American Insurance Co.*, No. 22-3192 (10th Cir. Jan. 17, 2024), https://www.ca10.uscourts.gov/sites/ca10/files/oralarguments/22-3192.mp3 ("Oral Argument"). Rather than providing the unambiguous meaning of "appearance damage basis," however, Landmark merely asserted that the interpretation of this term was "an extremely minor issue" prior to this appeal. *Id.* at 19:21–19:23.

court that this is an appropriate interpretation of "appearance damage basis." App. Vol. 8 at 1926. The district court thus adopted this definition in resolving both BSM's and Landmark's motions for summary judgment. App. Vol. 8 at 1957 ("'Appearance damage basis' as used in Section X.A. is where both sides agree on the value of the damage."); *id.* at 1715 ("The parties agree that 'appearance damage basis' is where both parties agree on the value of the damage.").

"[V]iew[ing] the evidence and draw[ing] reasonable inferences therefrom in the light most favorable to [BSM]," *Utah Animal Rts. Coal.*, 566 F.3d at 1242, BSM has come forward with evidence creating a factual dispute over whether the parties agreed that the value of the damage was $2.3 million, as provided in the EAC Spreadsheet, and thus settled this claim on an appearance damage basis. The record reflects that on June 24, 2019, EAC sent the spreadsheet to Mr. Durbin of Landmark for his review and approval before it was sent to BSM. The following day, Mr. Durbin directed EAC to send the spreadsheet to BSM to see if BSM agreed, and Mr. Durbin later testified that he had no problem with the spreadsheet. EAC then sent the spreadsheet to Mr. Bishop of BSM for his review. Mr. Durbin then specifically asked Mr. Bishop "[a]re you in agreement with the latest spreadsheet?" and Mr. Bishop responded, "[y]es sir, the numbers are acceptable." App. Vol. 5 at 1071. This exchange, viewed in the light most favorable to BSM, supports a reasonable inference that the parties agreed the claim would be settled based on the appearance value provided for in the EAC Spreadsheet.

The timing of the repairs and the circulation of the EAC Spreadsheet also creates a factual question regarding the spreadsheet's purpose. Landmark asserts, and the district

16

court concluded, that the EAC Spreadsheet was merely an estimate of the cost of fully repairing all the vehicles. But USA Dent conducted repairs in May and June 2019, and Mr. Bishop testified that the majority of the repairs were completed by late June or early July 2019. Thus, many of the repairs were completed *before* Landmark sought BSM's agreement on the EAC Spreadsheet on June 25. It is also undisputed that EAC and USA Dent were both present during EAC's assessment. In fact, EAC's June 4, 2019, report to Landmark states that "[p]arts were replaced as needed and panels were repainted as needed." App. Vol. 8 at 1871. This reference to ongoing repairs suggests that Landmark was aware BSM was conducting repairs, but still intended to circulate and receive BSM's agreement on the EAC Spreadsheet. Yet, there is no indication that Landmark ordered BSM to cease making repairs, nor is there any explanation for why Landmark would seek BSM's agreement regarding an estimated cost of repairs *after* a significant portion of those repairs had been completed. From this evidence, the jury could draw a reasonable inference that Landmark and BSM were arriving at an appearance damage basis settlement through use of the EAC Spreadsheet.

In addition, BSM asserted that Landmark has settled prior claims this way. This representation is bolstered by EAC's June 4, 2019, report, which provides "[t]he initial assignment involved *loss damage* to the vehicle inventory of Brandon Stevens Motors and Eddy's Motors, LLC, Chrysler Jeep Dodge located in Wichita, KS." *Id.* at 1870 (emphasis added). BSM also relies on Mr. Bishop's testimony that "[BSM] anticipated that the amount the adjuster had written the loss for, net of our deductibles for said loss, would be the amount that [BSM] would receive in compensation for -- for the insurance

17

claim." App. Vol. 3 at 697. BSM also references the testimony of two USA Dent representatives who state that their understanding was that the spreadsheet represented an agreed upon amount for the settlement. This evidence further supports BSM's position that the parties had reached an agreement to settle the claim based on the EAC Spreadsheet.

Finally, the Policy itself appears to undercut Landmark's argument that the EAC Spreadsheet merely estimated the cost of conducting full repairs, rather than paintless dent repairs, on BSM's vehicles. For example, Landmark argues that the Policy "simply does not give BSM the option of cutting a deal with USA Dent on the cost of repairs to the vehicles using the paintless dent repair method" while also "collecting from Landmark the larger sum of the estimated repair costs including the estimated cost to replace the damaged hoods, roofs and neck lids, as set out in the [EAC] spreadsheet." Appellee's Br. at 28. But Section X.D. of the Policy provides: "The 'Insured' agrees to use paintless dent repair procedures where legally permitted. If repairs are not completed using paintless dent repair procedures, where legally permitted, 'We' will not pay more than the amount that would have been incurred for necessary expenses using this method of repair." App. Vol. 1 at 169. If the Policy specifically provides that BSM is obligated to conduct repairs using paintless dent repair procedures where permitted, then it is not clear why Landmark would seek an estimated cost of an alternative, more expensive method of repair with the understanding that BSM would in fact conduct these more expensive repairs.

Despite the conflicting evidence, the district court found as a matter of law that the parties had not settled the claim because the present litigation highlights their disagreement regarding the purpose of the EAC Spreadsheet. The court relied on its factual finding from an earlier order denying BSM's summary judgment motion that the parties had never agreed Landmark would pay BSM the amount in the EAC Spreadsheet. But while that decision properly made factual findings and inferences in favor of Landmark, the non-moving party in BSM's motion for summary judgment, applying those same inferences in deciding Landmark's motion for summary judgment improperly relies on factual findings and inferences unfavorable to BSM, the non-movant. Although the parties *now* dispute whether they settled the claim on an "appearance damage basis," this does not mean the parties never reached an agreement regarding how to settle the claim. BSM asserts the parties reached such an agreement and Landmark subsequently reneged in bad faith and in violation of the Policy. As discussed, BSM has come forward with evidence from which the jury could find the parties reached an appearance damage basis settlement. To the extent the parties reached such an agreement, BSM may have been entitled to payment of that amount as a "pay[ment] for the loss in money," without any obligation to detail actual repair costs under the Policy. *See* App. Vol. 1 at 167.

Given these disputed material facts, the district court erred when it granted summary judgment based on its finding that the EAC Spreadsheet was solely an estimated cost of conducting repairs, and that the parties never settled the claim on an "appearance damage basis."

**2.　　Applicability of the "Actual Cost" Provision of Section IX.4.**

The district court held BSM cannot establish Landmark breached the contract when it failed to pay the EAC Spreadsheet amount because BSM's recovery is limited to only the "actual cost" of repairs. Section IX.4. of the Policy includes the provision addressing when Landmark shall pay only the "actual cost" of repairs to the insured. The relevant portion of Section IX.4., titled "Payment of Loss" provides:

> The Company at it's [*sic*] sole option may pay for the loss in money or may repair or replace the damaged or stolen unit or part thereof *but if requested by the Company, the Insured shall replace such unit or part thereof or furnish the labor and materials necessary for repairs thereto and the Company shall pay only the actual cost to the insured.*

App. Vol. 1 at 167 (emphasis added). The district court held that there were no disputed facts that could render the limitation to actual damages inapplicable. We disagree.

First, Section IX.4. allowed Landmark to pay the claim in money, repair the vehicles itself, or request that BSM make the repairs and then pay only the actual costs of those repairs. If, as BSM alleges, Landmark chose the first option—payment in money on an appearance damages basis—that payment is untethered from the subsequent restriction on actual cost of repair. Indeed, Section X.A. of the Policy expressly excludes settlements made on an appearance damages basis from its provisions governing labor rates and the cost of materials.

Second, Landmark never requested that BSM repair the damaged vehicles. The district court made a factual finding that Landmark did not ask BSM to make the repairs solely because BSM had already done so. Thus, the court held that the "actual cost" provision applied in this case despite the absence of any request from Landmark that

BSM furnish the repairs. But this finding, which was unfavorable to BSM, was inappropriate in the context of a motion for summary judgment because the evidence could support a reasonable inference that Landmark did not make such a request to BSM for other reasons. *See Utah Animal Rts. Coal.*, 566 F.3d at 1242 (10th Cir. 2009) ("When applying [the summary judgment] standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.").

For example, the parties do not dispute that USA Dent was present and working with EAC during the investigation, or that EAC provided a report in early June 2019 noting "[p]arts were replaced as needed and panels were repainted as needed." App. Vol. 8 at 1871. This evidence suggests that Landmark was aware BSM was conducting repairs. Despite this knowledge, the record and the parties' representations at oral argument indicate that Landmark never instructed BSM to stop conducting repairs, and instead moved forward with completion of the EAC Spreadsheet. Viewing the evidence and drawing all reasonable inferences in the light most favorable to BSM, it would be reasonable to infer that Landmark chose not to request that BSM furnish the repairs as provided in Section IX.4. because Landmark intended to pay for the loss in money pursuant to an appearance damages agreement based on the EAC Spreadsheet. The district court is correct that Landmark now disputes any such agreement, but there is evidence from which a jury could determine otherwise.

For the foregoing reasons, the district court erred when it relied on Section IX.4. to grant summary judgment for Landmark. There exist material facts in dispute regarding

whether Landmark and BSM settled this claim on an "appearance damage basis," thereby obviating the need for detailed repair records.

**3.      Costs and Attorney's Fees**

Finally, BSM asserts that reversal of the motion for summary judgment requires that any cost awarded to Landmark pursuant to Federal Rule of Civil Procedure 54(d)(1) be vacated. BSM also argues it is entitled to pursue its claims and its right to attorney's fees under Kansas state law.

*a.      Landmark's Request for Costs*

Landmark filed a request for costs to which BSM filed an objection. BSM now argues that reversal of the order granting summary judgment requires that any cost award be vacated. However, the district court docket does not reflect that the court has granted Landmark's request. Thus, no costs order exists to be vacated.

*b.      BSM's Claim for Attorney Fees*

The district court concluded that, "[b]ecause Landmark is entitled to summary judgment on both claims, BSM's claim for attorney fees is moot." App. Vol. 8 at 1970 n.11 (first citing to Kan. Stat. Ann. § 40-908 (addressing attorney fees when "judgment is rendered against any insurance company"); and then citing to Kan. Stat. Ann. § 40-256 (same)). On appeal, BSM argues that, if we reverse the district court's grant of summary judgment, BSM is entitled to pursue its claims and right to attorney's fees under Kan. Stat. Ann. § 40-908. The Kansas statute upon which BSM relies provides:

> That in all actions now pending, or hereafter commenced *in which judgment is rendered against any insurance company* on any policy given to insure any property in this state against loss by fire, tornado, lightning or hail, the court

in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such action including proceeding upon appeal to be recovered and collected as a part of the costs: Provided, however, That when a tender is made by such insurance company before the commencement of the action in which judgment is rendered and the amount recovered is not in excess of such tender no such costs shall be allowed.

Kan. Stat. Ann. § 40-908 (emphasis added). Although we reverse the district court's grant of summary judgment in favor of Landmark, BSM is not entitled to attorney's fees. At this stage of the proceedings, no judgment has been rendered against Landmark. Our decision merely permits the litigation to proceed to a final judgment, which will determine which party prevails.

### III.      CONCLUSION

There exists a genuine dispute of material fact regarding whether the parties agreed to settle this claim on an appearance damage basis, and thus whether Landmark breached the Policy. We therefore REVERSE the district court's grant of summary judgment and REMAND this case to the district court for further proceedings.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

23